IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIGID PAYNE and** | : | |
| **ANDREW PAYNE** | : | |
| **individually and as wife & husband** | : | |
| | : | |
| **215 Harding Avenue** | : | |
| **Havertown, PA 19083** | : | **CIVIL ACTION** |
| **Plaintiffs** | : | |
| | : | **NO.** |
| | : | |
| **v.** | : | |
| | : | **COMPLAINT** |
| **THE COUNTY OF DELAWARE,** | : | |
| **PENNSYLVANIA** | : | |
| | : | |
| **DELAWARE COUNTY COUNCIL** | : | |
| | : | |
| **COUNTY COUNCIL MEMBERS** | : | |
| **DR. MONICA TAYLOR,** | : | |
| **MS ELAINE PAUL SCHAEFER,** | : | |
| **MR.  KEVIN M. MADDEN,** | : | |
| **MS. CHRISTINE A. REUTHER,** | : | |
| **MR. RICHARD R. WOMACK,** | : | |
| | : | |
| **MR. JONATHAN LICHTENSTEIN** | : | |
| **MS. CHRISTINE KECK** | : | |
| **MS. BARBARA O'MALLEY** | : | |
| **MR. EDWARD BEEBE** | : | |
| **MS. REGINA RODIA** | : | |
| **MR. ANTHONY MIGNOGNA** | : | |
| **MS. SAMANTHA COX** | : | |
| | : | |
| **JOHN AND JANE DOES #1-10** | : | **JURY TRIAL DEMANDED** |
| **201 West Front Street** | : | |
| **Media, PA 19063** | : | |
| **Defendants** | : | |
| | : | |

**CIVIL ACTION COMPLAINT**

BRIGID PAYNE, an adult female, and her husband ANDREW PAYNE, by their

undersigned counsel, Mark D. Schwartz, Esquire,  bring this action against THE COUNTY OF

1

DELAWARE,  PENNSLVANIA (the "County") and the above referenced entities and individuals in both their individual and official capacity, alleging as follows:

### INTRODUCTION

1.   The Plaintiffs Brigid and Andrew Payne (together, "Plaintiffs") are long time and current employees in Delaware County's Department of Emergency Services ("DES"), who bring  this action against the County, together with those named hereinabove, acting both affirmatively and negligently. The Defendants have discriminated against Brigid Payne  in violation of her rights under the United States Constitution and in violation of applicable federal civil rights law on account of her sex. Further, Defendants have retaliated against both Plaintiffs for standing up for themselves and having filed EEOC Charges against the County. Plaintiffs have suffered, enduring a hostile and illegal working environment maintained by Defendants that is  contrary to law and stated County policy.  In addition, Plaintiffs assert various state law claims against the named individual defendants.

2.   Plaintiffs bring this action pursuant to federal law; namely for violation of their U.S. Constitutional Rights pursuant to the Civil Rights Act of 1866, 42. U.S.C. Section 1983 and for violation of their Civil Rights pursuant to Title VII of the Civil Rights Act of  1964 ("Title VII") 42 U.S.C. § 2000e *et seq*.  Relief is also sought pursuant to state law, where Plaintiffs seek compensatory and punitive damages (where applicable)  from Defendants.

### PARTIES

3.   **BRIGID PAYNE** ("Plaintiff Brigid" or "Brigid" ) is a female, born on January 6, 1988, who resides in Havertown, Pennsylvania (Delaware County)  with her husband, Andrew Payne and family. Since 2008, she has been and  remains an  "employee" as defined in the above-referenced federal statutes and enjoys protected status thereunder, when it comes to her sex. She is further protected  thereunder when it comes to the retaliation she has

experienced as a result of advocating for herself. She has a right to work in a non-discriminatory and non-retaliatory working environment.

4. **ANDREW PAYNE** ("Plaintiff Andrew" or "Andrew") is a male, born on July 2, 1986, who resides in Havertown, Pennsylvania (Delaware County) with his wife, Brigid and family. Since January, 2007 he has been and remains an "employee" as defined in the above-referenced federal statutes, and enjoys protected status thereunder regarding retaliation that he has experienced as a result of advocating for his wife and himself as well as his right to work in a non-discriminatory working environment.

5. Defendant **THE COUNTY OF DELAWARE** is a Pennsylvania municipal corporation with home rule powers. It is located in Media, Pennsylvania. It is an "employer" as defined in the above-referenced federal statutes.

6. Other Defendants include the County's governing body, known as County Council as an entity, together with its individual members thereof consisting of Dr. Monica Taylor, Ms. Elaine Paul Schaefer, Mr. Kevin M. Madden, Ms. Christine A. Reuther, and Mr. Richard R. Womack. Other Defendants include Mr. Jonathan Lichtenstein, Esquire, former Deputy County Solicitor & now County Solicitor, Ms. Christine Keck, County Chief Human Resources Office/ Personnel Officer, Mr. Edward Beebe, former DES Deputy Director, promoted to Interim Director, Ms. Regina Rodia, DES Office Manager, Ms. Samantha Cox, DES Supervisor of Training, and Mr. Anthony Mignogna, former Chief of Communications, now promoted to Deputy Director. This is in addition to other John and Jane Doe defendants who include previous Council persons, persons responsible for personnel matters, and other supervisory employees who will be identified during the course of discovery.

7.   All of these supervisory individuals named hereinabove  have facilitated and protected Former DES Director Timothy Boyce ("Boyce") when it came to his well- known and inappropriate sexual behavior in two ways. First, as supervisory personnel, they either knew of or had reason to know of  Boyce's sexual misbehavior, including improper conduct and advances directed at Plaintiff Brigid.  Second, the official positions of all of those named came with an affirmative obligation to inquire and investigate what was taking place in DES so as to rectify any improper matters. Instead, those named enabled Boyce, in his own words, to "hide in plain sight" for many years. Since being moved to the position of Boyce's  Executive Assistant in February of 2021 and subsequent thereto, Plaintiff Brigid was subjected to  Boyce crass sexual misbehavior and improper advancements toward her.  As a result, Plaintiff Brigid had had to endure an illegal working environment, experiencing retaliation by those individual defendants named above, even after Boyce's departure, up to and continuing through the filing of this action.  In addition, Plaintiff Andrew has also suffered as a result of being retaliated against for standing up for his wife. If these Defendants had exercised their affirmative obligations, Plaintiffs' harm would have been obviated.  At all times relevant hereto, all individual Defendants were acting in their individual and official capacities and under color of the law of the Commonwealth of Pennsylvania.

## JURISDICTION & VENUE

8.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this is a civil action arising under federal law.

9.   Plaintiffs also invoke the supplemental jurisdiction of this Court over each of their related claims arising under state law  pursuant to 28 U.S.C. §1367(a), all of which are so related to the federal law claims that they form part of the same case or controversy under Article III of

the United States Constitution.

10.  Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) and (c), since both Plaintiffs and Defendants reside and do business in the Eastern District of Pennsylvania, and since the events giving rise to Plaintiffs' claims occurred in the Eastern District of Pennsylvania.

**FULLFILLMENT OF CONDITIONS PRECEDENT**

11.  Plaintiffs have fulfilled all conditions precedent to the institution of this action under law.

12.  Plaintiff Brigid Payne dual-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRA") on or about June 2, 2024. The EEOC assigned her charge # 530-2024-06489. The Charge as filed claims sex discrimination and retaliation on a continuing basis commencing in September of 2022 and continuing to the present time.  Specifically, as set forth herein, Plaintiff  Brigid has been discriminated against, retaliated against  and adversely impacted  as a female person who has been forced to work in an illegal sexist environment, as created by Boyce, all of which has been allowed to continue by the other named Defendants to her detriment.

13.  Pursuant to Plaintiff Brigid Payne's October 7, 2024, request to the EEOC, the EEOC has closed its review of the the matter and the Department of Justice issued a "Right to Sue" letter to this Plaintiff on  October 29, 2024 given that the County is a governmental entity. Receipt by Plaintiff's counsel was acknowledged on  October 30, 2024.

14.  Plaintiff Andrew Payne  dual-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRA") on or about June 2, 2024. The EEOC assigned his  charge # 530-2024-06491. The Charge as filed claims retaliation on a continuing basis for his complaints of  sex

discrimination and harassment with respect to his wife  commencing in September of 2022 and continuing to the present time.  Specifically, as set forth herein, Plaintiff Andrew  has been discriminated against, retaliated against,  and adversely impacted for standing up for the rights of his wife and for standing up for his and her right to work in a legal non-sexist and non-retaliatory environment. The present illegal environment as created by Boyce has been allowed to continue by the other named Defendants.

15.  Pursuant to Plaintiff Andrew Payne's October 7, 2024 request to the EEOC, the EEOC has closed its review of the matter and the Department of Justice  issued a Right to Sue letter to this Plaintiff on October 29, 2024 given that the County is a governmental entity. Receipt by Plaintiff's counsel was acknowledged as of October 30, 2024.

16. This lawsuit has been timely filed as it has been brought within ninety (90) days of receipt of the issuance of the Right to Sue letter.

### FACTS

### FACTS PERTAINIMNG TO BRIGID PAYNE

17.  Plaintiff Brigid  Payne ("Brigid") began working for Delaware County's DES in 2008 in the Radio Room as a 911 call taker.  She continued in that position for approximately 12 years, earning  between $52,000 and $55,000 a year.

18.  In February of 2021, Brigid became Boyce's Executive Assistant, taking a salary cut to $43,000 a year.  During her year in that position, and afterwards, she witnessed odd situations that she felt were inappropriate.  For instance, Boyce would gather young females, including Brigid, sometimes together, sometimes separately, for  events that had nothing to do with their job responsibilities.  He would bring females, including Brigid, to outside events to show them off. Occasions would include a funeral, a flag raising event at the courthouse, or large radio project meeting.  The fact that they were on display made Brigid and others feel uncomfortable.

6

19.  Once she began serving  as Boyce's Executive Assistant,  Brigid  immediately noticed Boyce's obsession with her predecessor in the Executive Assistant position, employee Maille Bonsall. He always wanted to know where she was. She would be out on a  break and Boyce would ask Brigid or other employees to go find her, allegedly because he needed to speak with her.  Brigid  instead discovered that, at best,  it would involve unnecessary and trivial matters.  Brigid  also noticed that Boyce would go so far as to  search for Ms. Bonsall on the security cameras, even when Ms. .Bonsall was on break. It was obvious to Brigid  that Ms. Bonsall was uncomfortable with this unwelcome conduct.

20.   During the first week of October, 2021, while acting as Boyce's Executive Assistant, Brigid witnessed Boyce's inappropriate behavior with Ms. Sara Senkow upon her return from a vacation from Key West.  Boyce asked Ms. Senkow to show him  vacation pictures which she did. Then he made a point of saying that he wanted the "good pictures", inferring any sexy pictures or nude photos.  Ms. Senkow said that he was shown what she had.

21.   In March, 2022,  Boyce offered Brigid a pay raise and a new position working under Larry Bak in Emergency Management as an Emergency Planner, then making just under $47,000 a year. Brigid jumped at the opportunity as she did not feel comfortable directly working for Boyce.

22.   Then in June, 2022, without  either a raise or documentation of the move,  Brigid was moved to work under  supervisors Anthony Mignogna and Samantha Cox in 911 Quality Assurance.  No duties or job description were provided to her either, with her title still listed as Emergency Planner.

23.   Since the start of working in 911 Quality Assurance,  Ms. Cox isolated  Brigid from others.  Brigid's  working conditions were such that she had to literally work in a closet,

separated from everyone in the training department and excluded from daily matters as per

Cox's direction. It was not until August of 2023, when Brigid moved back to Emergency

Management and was under the supervision of Sara Senkow in the Homeland Security section

there, that Brigid was allowed to work somewhere other than in a closet.

24.    Several times, from June, 2022 up until February of 2023, Brigid approached her

superior, Anthony Mignogna, to be involved in the CTO training class, as she wanted to further

her experience, and work more directly with the call takers. After not getting a response, she

approached him a second time. He simply dismissed her without giving her an answer. When

she approached him a third time asking why she had not been able to be a part of the class, his

response was "Why would I even want to do it ? What is it going to get me? " The CTO class

began in February of 2023, with Brigid having been left out.

25.    Also within the same time frame referenced in the preceding paragraph, Brigid met

with Mr. Mignogna and Ms. Cox to discuss improving her duties and education with respect to

Quality Assurance. Brigid asked to be more involved with call takers in reviewing Quality

Assurance documents. Doing so would enable her to have a better understanding of her job and

more responsibilities. Brigid never received so much as a reply.

26.    In July of 2022, sensitivity training was purportedly conducted to address bullying

and harassment issues in DES. For example, Brigid had made objections to Boyce concerning

the way that Regina Rodia would speak to her, posing problems when it came to Brigid's daily

work. Boyce assured her this would be addressed in upcoming sensitivity training. However,

only certain people could be a part of it. Brought to Boyce's attention were interoffice issues

and how management was not discussing issues properly with staff members. Complaints had

been made about DES' never doing anything about complaints. Boyce directed Anthony

8

Mignogna to have all management (front office) employees take an (APCO) Association of Public Safety Communication Officials Course. Mignogna was one of a handpicked group to do the training, Complaints were made about a lack of follow-up with respect to the class. Upon information and belief, this class was not provided to all management employees and was merely used as a band-aid in merely sweeping harassment issues under the rug.

27.    In the Summer of 2022, DES announced the beginning of Certified Training Officer ("CTO") class, to start in Winter of 2023. This class enables coworker-to-coworker training. Brigid asked multiple times to be able to take the class. She wanted to be certified to work and train with current and new call takers. She was denied participation and never given a solid answer as to why she could not be a part of the program.

28.    Continuously, Brigid has been denied the opportunities to advance herself both on account of her female status, and not being one of Boyce's favorites, due to her refusal to accede to Boyce's inappropriate demands, and on account of the attendant retaliation visited upon her by him and his subordinates who included Defendants Beebe, Mignogna and Cox .

29.    However, things got worse as a result of two encounters that Brigid had with Boyce in the Fall of 2022.

30.    Responsible for DES's uniform budget since 2021, in mid-September, 2022, Brigid was in Boyce's office regarding Boyce's previous request that she order tank tops for female employees. Also present with Boyce were Deputy Director Edward Beebe and Office Manager Regina Rodia. At this meeting Boyce asked Brigid to try on one of the tops. Given the brief nature of the tank tops, Brigid put one on in the bathroom and returned to the meeting having covered the tank top by wearing her cardigan sweater. Brigid then specifically told Boyce that these tank tops were totally inappropriate for work wear. She specifically said that if someone

9

were to bend down, her chest would be exposed. Boyce's response was: "Oh really ! Let me see. Bend over." Brigid refused, saying that it would be inappropriate. Upon information and belief, neither Beebe nor Rodia reported this inappropriate behavior to HR/ Personnel.

31. Several minutes later, Brigid was picking up items off of the floor, still wearing the tank top and holding up another shirt to cover her chest. Despite Boyce's earlier request having been flatly refused, Boyce said "Oh, you don't have to do that (meaning covering her chest) Let me see." Again, this was all in the presence of the other two individuals, one of whom was the Deputy Director (now promoted to Acting Director) Edward Beebe. The other person present, Ms. Regina Rodia, told Boyce "No Tim, that is not appropriate". Notwithstanding this incident, upon information and belief, neither Beebe nor Rodia ever exercised their responsibilities to report the situation to HR/ Personnel.

32. On September 26, 2022, Plaintiff Brigid was in Tim Boyce's office from approximately 2:00 p.m. through 2:30 p.m. A discussion began concerning a County-supported 5k run to raise money for fallen first responders. Brigid mentioned that, last year, Kevin Madden had won. After Boyce criticized Madden in general, he brought up rumors about Madden's sexual behavior, claiming that possibly, he was gay. Boyce then said " If a guy does something at a party with another man, he is gay. But, if a girl does something with another girl, they are just playing around." He then continued talking about sex amongst women, specifically telling Brigid that he thought that Brigid had sex with other women. Her response was: "Never." Notwithstanding her clear discomfort, he persisted, insisting that Brigid had sex with other women, saying " Oh, come on ! Never ?" He also brought up the subject of drinking and drugs. Brigid tried to leave multiple times. However, Boyce kept the entirely inappropriate conversation going, bringing up the fact that Brigid used to "hang out" with fellow worker Maille Bonsall,

10

accusing Brigid of "making out" with her. Undeterred, Boyce asked, "you never went behind closed doors with a girl before and played around ?" Brigid again said "no" saying multiple times that she was a very "PG " type of person and that  she was uncomfortable with this conversation.  Nonetheless,  Boyce persisted, asking her at least four different times and in different ways about her sexual history with women, a history which has not existed. He wouldn't take "no" for an answer, thinking that Brigid  was hiding something.

33.    At that same session Boyce told Brigid that when he was younger and drinking, that he had two females wanting to have a threesome with him at a party and that they were down on their knees, confused and not knowing what to do in playing with each other.  By this time, Brigid  had already tried to leave at least twice,  just shaking her head confused as to why he was saying all of this. Then he asked Brigid  to "make sure you don't tell my wife about this." As he started walking to leave, he stopped her and said: " All this stays here, right?"  So that she could escape him, she agreed and left.

34.    On that same day, September 26, 2022, approximately 40 minutes later, Brigid returned to Boyce's  office, when he was not there. She chose this time to gather up boxes of clothing orders, hoping to avoid him. However, he ended up returning, trying to talk to her. Notwithstanding, she was concentrating on simply gathering the items and leaving. His response to this was "Oh, you won't even look me in the eye now, huh?" Again Brigid  tried to cut him off and then simply left, as it was the end of the work day.

35.    The very next day, September 27, 2022, Brigid  asked to speak with Samantha Cox and Anthony Mignogna, privately in Mr. Mignogna's office. Both were Brigid's supervisors at this time. Ms. Cox tried to excuse herself, asking if she was sure that Brigid wanted her there. Brigid's response was "Yes, I have something important to talk about with you two." Brigid  had

written down notes regarding what had just taken place with Boyce. She began the conversation by saying that Boyce had made her feel very uncomfortable. Cox and Mignogna requested more details. At that point Brigid said "If I give you any further details you are going to be required to report it." They acknowledged that they understood and would do so, requesting that Brigid proceed further. She did so by reading her notes that detailed her previous experiences with Boyce to both of them. Afterwards, Brigid said that she wanted to limit her future dealing with Boyce and didn't want to visit his office for any reason. Ms. Cox told her "It's your job, you have to do that". Given that Brigid needed her job, this interchange resulted in making Brigid feel helpless, compromised, and fearful that she would be retaliated against, all of which has eventuated.

36.    Given the hereinabove-described incidents witnessed by Beebe and Rodia, now reported to Brigid' superiors Cox and Mignogna, nothing appeared to have been reported to HR/Personnel or rectified. To the contrary, within approximately one month thereafter, Mignogna was promoted from Deputy Chief of Operations to Chief of Operations by County Council.

37.    After this discussion with superiors Cox and Mignogna, on September 27, 2022, Brigid, for the first time, told Andrew what she had experienced with respect to Boyce, including but not limited to the "tank top" incident.

38.    As a result of what Brigid told her husband, the couple experienced tension between themselves concerning how to continue in such an environment. Given the state of affairs pressing them to leave during Boyce's tenure and thereafter, they worry about where they can go and what sort of security, if any, they would have. That tension between them as to why this has all happened to them, continues to this day.

39.    In May, 2023,  Brigid started documenting notes of her daily experiences regarding management's retaliation against her in undermining and criticizing her job performance. This included, but was not limited to, Samantha Cox's remarks about the pace in which Brigid was completing her work.

40.    Retaliation further included  Brigid's routinely being excluded from training.  Some examples include the following: In January, 2023, Defendant Cox excluded her from training for "Prepared Live" a new system providing call takers with Face Time or Skype-like abilities with incoming 911 callers. In June of 2023, Defendant Cox  would not  allow Brigid to participate in training on a system called "APCO Intellicom" used in the 911 center for processing Emergency Medical dispatch calls. Both of these training opportunities were not even shared with Brigid even though her job required her to critique call takers on how they use these systems. Brigid had to go out of her way to request to be a part of them, feeling unwelcome and feeling that she now forced herself into training, that she ordinarily was entitled to. It was only after making it known that she was not included and needed to be, that she was eventually allowed the training.

41.    On August 15, 2023,  Samantha Cox emailed Brigid that in order for Brigid to continue to assist Joe McGinn in Active Shooter trainings, which Brigid had been involved in since 2021, that Brigid would need to achieve an impossible benchmark when it came to completing Quality Assurance forms.  Brigid was already completing approximately 40-45 forms daily, but was told that she now must complete 60 a day or 300 per week. This goal was clearly unattainable. Brigid reported this to Tim Boyce in a meeting and also informed him that she was being shunned. His response was that there was nothing that he could do about it. This brought Brigid to tears.

42.    After leaving the August 15, 2023 meeting with Boyce, Brigid discussed the matter

with her husband Andrew, who that same day met with Boyce at approximately 4:15 p.m. Andrew complained to his superior, Boyce, that, day in and day out, Brigid had to work sitting in a closet, constantly under a microscope on what she accomplished each day, in contrast to other DES employees who did virtually nothing.

43.    At this meeting, Boyce pressed Andrew, prodding and repeatedly asking him "if it was something that I (Boyce) had done or anyone else had done?", clearly probing as to whether Andrew knew about what had previously taken place with his wife. Uncomfortable with having a one-to-one conversation with Boyce, Andrew replied "this is above us and I do not want my response to be perceived as a threat or a false accusation." Andrew felt that the meeting should have included HR/Personnel.  However, given past experience, Andrew felt that Boyce had everyone in his pocket and that there was nowhere for him to go with the information as to what had transpired. Both then and now Andrew has felt that his complaints would not  be taken seriously or handled properly. In fact, Boyce continued pushing Andrew to see whether Andrew would complain about Boyce's behavior towards his wife.  Andrew finally complained,  telling Boyce about Boyce's improper suggestions to  Brigid that she  had sex with other females.

44.    Upon  mention of Boyce's past questioning Brigid about having sex with females, Boyce's  demeanor immediately changed.  His eyes becoming watery. Boyce agreed that his conversation with Brigid was inappropriate and that his remarks should not have been made. Boyce specifically admitted that what he said was wrong and immature, saying that he had faults that he had to work on. Further, Boyce claimed that  he had changed since the day he had made those remarks, because it made Brigid  feel uncomfortable.

45.     At that meeting Andrew also told Boyce about Boyce's repeatedly admonishing Brigid: "oh…. What… you're not going to look at me now." Boyce admitted to it and said that it

14

was wrong on his end. Andrew told him about the daily issues that Brigid was dealing with, including Samantha Cox's unattainable work quotas. Boyce tried to absolve himself of his obvious responsibility by telling Andrew that it was difficult to deal with certain people in the building and that he was working to try to talk to Cox. The conversation ended with Boyce offering a supposedly "sincere" apology for his actions and pledging that he would also apologize to Brigid. So as not to make matters even worse for his wife Andrew asked Boyce not to do so given the trauma that his behavior had already caused.

46.    On August 17, 2023 , Brigid was directed to attend a meeting in Boyce's office with Deputy Director Beebe present. She was offered to a position change which would allow her and to return to Homeland Security/ Emergency Management and work under Sara Senkow. Yet, no effort was made to resolve the issues that Brigid had raised while she was working under Anthony Mignogna or Samantha Cox . Her concerns were just swept under the rug.

47.    Notwithstanding the fact Brigid had left Mignogna's team in the 911 Training Department later in August, 2023, Mignogna made comments to others characterizing her departure as being abrupt, as if she was at fault and that there was something the matter with her. Naturally, this made her feel uncomfortable. When Brigid complained to him personally and repeatedly about his refusal to allow her to progress, he listened, but pointedly had no comment.

48.     By February 22, 2024, Brigid's main responsibility was to bring the Delpass system up to date, a system dealing with school active shooter scenarios. A great deal of work is required to bring each school into compliance and ensure that phone lines and alarm systems were working properly. On February 22, 2024, Brigid brought to her supervisor Sara Senkow's attention the difficulties she was facing while working on Delpass, requesting help to improve the situation. Brigid sent an email to Ms. Senkow, describing the issues she faced and that she

needed help with the responsibilities piling up. Ms. Senkow printed the email and brought it to Boyce. Boyce claimed that he no longer wanted to be involved with the program. This program meant a lot to Brigid, something she had worked very hard on and didn't want to see diminished. After a conversation about the issues with the Delpass system, Boyce proceeded to offer Brigid a place in Emergency Management  to work under Ed Kline. However, despite Boyce's criticizing the Delpass System and removing Brigid, she later learned that he continued the project without her. This was simply more in the way of not resolving Brigid's issues,  sweeping matters under the rug and retaliating against her.

49.     Then in March, 2024, Brigid was moved once again from her work duties in Homeland Security/Emergency Management to start an entirely new job in Emergency Management under Ed Kline. This position, together with annual county raises, pays her currently $56,000 per year.

50.     All the while, Brigid has been disadvantaged by Boyce's juggling pay scales and job descriptions to favor the young women he was attracted to, as well as management's retaliation against her.  The result necessitated Brigid's having to repeatedly and completely change jobs while others in the Department did not have to do the same.

51.     More recently, reports of Ed Kline's bullying women had been made to HR/Personnel employee Dana Howard by Brigid in her email to Dana Howard on October 24, 2024. Brigid had previously made those concerns known to Mr. Beebe on  October 21. Brigid and two other female co-workers, Maria Baez and Tammi Maciolek had experiences with Ed Kline bullying them. On November 26, 2024, Brigid was called into a meeting with Howard, Ed Kline, Beebe and Maria Baez.  The fact that Ms. Howard directed the women to meet with her and the accused , Mr. Kline,  was intimidating, entirely inappropriate, and unprofessional, only

16

exacerbating the women's fears. With little or no effort by Ms. Howard to ensure the women's safety and security, Brigid left the meeting convinced that this was nothing but another effort to sweep the issue under the rug.  Nothing appears to have been rectified since.

52. Instead of  Ms. Howard's self-description as " coming from a place of care", she has proven to be an ally of Beebe, Mignogna, and Regina Rodia,  promoting the maintenance of a circus-like and retaliatory environment against those with HR complaints, largely spending her day in Beebe's office gossiping. Despite Ms. Howard's continued physical presence in DES, the work environment for Plaintiffs has  gotten worse,  instead of better.

53. From Mid-September of 2022 until the present time, Brigid has felt hopeless, worried that she would never be able to make something of herself or progress in DES. The incidents described hereinabove  have made her feel worthless and unsafe. Furthermore, those Defendants named have discriminated against her and retaliated against her for standing up for herself and not submitting  to Boyce's offensive requests.

54. Again, feeling disregarded, shunned, helpless, underappreciated, and worthless, Brigid has concluded that her only option is to leave DES and the County.  However, having worked there for almost two decades now, she should have been able to advance her career. Due to this demeaning treatment she has considered and applied for jobs elsewhere. However, this has only increased her distress and anxiety as she recognized that she should not have to give up working at DES where she had the right to have a more successful and better paying career, without undergoing the experiences that she has been subjected to. Accordingly, Brigid brings this lawsuit due to the discrimination and retaliation she has experienced,  as well as due to the hostile working environment that she has had to endure.

17

**FACTS PERTAINING TO PLAINTIFF ANDREW PAYNE**

55.     Plaintiff Andrew Payne ("Andrew") has been an employee of Delaware County's DES for 18 years, beginning January, 2007 .

56.     Andrew started in the position of  call-taker, then police dispatcher, fire dispatcher and finally assuming, on April 1, 2024,  his current position in Emergency Management as Systems Coordinator.

57.     Andrew adopts and restates the above facts section pertaining to his wife Brigid.

58.     In January/February of 2023, Andrew met with DES Chief Supervisor Joseph Blair regarding a sick time letter that included dates that Andrew missed work, due to the attendant stress of learning what his wife had experienced with Boyce in the Fall of 2022. After the meeting with Blair, he immediately insisted to see Defendant Mignogna, who was then Chief of Operations.   In a discussion in Mignogna's office, with Blair also present, Andrew set forth the problems that he was experiencing working at DES due to his wife's sexual harassment by Boyce  and the attendant comments that Boyce had made to Brigid.  The response that Andrew repeatedly got from Mignogna was "What do you want me to do about it?" It was clear to Andrew that   management very well knew that Boyce was a problem, but that management would continue ignoring his behavior, despite clear affirmative responsibilities for management to do otherwise.

59.     Andrew specifically adopts and restates paragraphs 42 through 45, which set forth what took place in a meeting between Boyce and Andrew on August 15, 2023 regarding Brigid's treatment.

60.     Simply stated, Andrew has come forth to report  multiple issues over the previous several years to DES management,  some of which involve his wife and  some of which involve

18

him. These reports of his should have proceeded further to HR/Personnel and County Council. However, it appears that these reports were ignored and no remedial action took place.

61.    As a result, it became clear, then and now, that Plaintiffs were helpless to accomplish anything given Boyce's predominance. Even with Boyce's removal gone,  as a result of their complaints past and present to HR/ Personnel and to their superiors, Plaintiffs have been retaliated against.

62.    Retaliation with respect to Andrew has included his exclusion from receiving overtime pay, being prohibited from going into the Radio Room, and being denied other possible assignments and  promotions. Throughout his entire tenure Andrew has applied for most every available opening.  For example, in September of 2023, Andrew was denied a promotion to Supervisor, despite superior qualifications and certifications to the candidate.  Andrew recognized that he would never rise above his current status make anything of himself despite his tenure of approximating 2 decades.

63.    In November of 2023, while still working inside the Radio Room as a dispatcher, Andrew reached out to Boyce and Larry Bak regarding joining DES'  HAZMAT Team. Later, in a separate meeting with Boyce on December 22, 2024, Boyce mentioned to Andrew a possible position in the front office in Emergency Management. However, it was not until a meeting with Larry Bak in January, 2024 that it became clear that there was an opening for a systems coordinator.  When  Boyce and Andrew discussed that job in  Emergency Management. Andrew explained that this was not specifically what he wanted since he felt that he should have instead been promoted to a Supervisor or Training Officer. Nonetheless, Andrew thought he had to accept the move, stating at the same time that it was important for him to also continue to work in the Radio Room.  Boyce assured Andrew that he would have the option to continue to work in

19

the Radio Room, just like the other management employees. Notwithstanding that promise, when Andrew was moved on April 1, 2024 into Emergency Management, he was and remains barred from the Radio Room resulting in his inability to earn overtime.

64. February 7, 2024 was the date of an East Lansdowne fire and shooting, an incident that made national news, as the perpetrator held his family hostage while shooting at police, subsequently killing those held, by lighting the house ablaze.  During this incident, as a dispatcher, Andrew was working the DES fire console, handling the incident, dealing with the medics and officers who had been shot. The seriousness of this incident really hit home for Andrew as his own father, a police chief in Millbourne, could very well have been involved  in this incident.

65. As the incident was happening in real time,  Defendant Samantha Cox (Supervisor of Training) came into the Radio Room.  Defendant Mignogna came into the room later as the incident expanded.  All the while, Cox  taunted Andrew with sarcastic comments such as "Ohhh should we go pull the dispatcher off the radio now ?" These demeaning comments were in reaction to Andrew's having recently raised mental health issues, a common occurrence which dispatchers inevitably experience.  Another dispatcher was appalled at her comments, exclaiming "Did she really fucking just say that?" Cox, then sitting at the supervisor console in close proximity to Andrew, repeated the comment. Andrew was  appalled and emotionally overwhelmed that a management leader would direct such comments at him,  let alone while the incident was still very active.

66. Andrew did reach out to Boyce  a few days later. On a telephone call, Andrew reported to Boyce what Cox said. Boyce said that there were issues in dealing with Cox. Shortly thereafter, in a separate call,  Boyce followed up with Andrew telling him that it was "important

to speak up." Andrew also discussed this incident with Mignogna. On February 12, 2024, together with Union President Daniel Harold, Andrew expressed his concern and disgust with Cox's comments. Despite being Cox's supervisor, Mignogna did not suggest a response to the incident, other than to comment that Cox was immature.

67.     To Andrew's knowledge, no remedial steps were administered or consequences made with respect to Cox as a result of his complaint. Instead, after Andrew's meeting with Mignogna, Cox seemed emboldened, walking around and trumpeting that there was "no hazmat job anymore." This was clearly directed at Andrew who was previously told by Boyce that he would be moved to the Hazmat job. Moreover, Cox made a point of making this humiliating comment in front of Brigid.

68.     As of Andrew's later meeting with HR/ Personnel on May 9, 2024, he learned that no record existed of Mignogna documenting the incident that transpired with respect to Defendant Cox. This was consistent with Andrew's experience with Defendant Mignogna, who to Andrew's knowledge, never documented or passed on anything despite the fact that his job responsibilities so dictated.

69.     Andrew was moved on April 1, 2024 into the previously discussed management job in Emergency Management, joining the Hazmat team as a Systems Coordinator. Andrew asked Boyce about his schedule and Boyce directed him to speak with Defendant Mignogna. Andrew called Mignogna and they discussed vacation time. Mignogna said that Andrew would have to lose days. Andrew offered alternatives which Mignogna did not accept. Defendant Mignogna told Andrew that his very working there could create issues between peers. Thanks to Boyce and his successors running DES, employees are assigned fictitious titles which don't relate to function. For example, Steve Castellano has been placed in the job titled "Chief of

21

Training" while he does nothing associated with training.  The result is that Castellano and other management level employees are able to work overtime in the 911 room , while Andrew has not been afforded the same opportunity.  Upon information and belief, Defendant O'Malley has long known of this chaotic and discriminatory situation with respect to fictitious job descriptions and fictitious titles, without rectifying the situation.

70.   On April 3, 2024, Andrew questioned Defendant Mignogna as to why he had not been allowed to sign up for various Radio Room shifts, given that Boyce had previously assured him he could do so. When Andrew told Mignogna that he intended to speak to Boyce about the issue,  Mignogna objected. While  Andrew met with Boyce, Mignogna went directly into Defendant Edward Beebe's office. Later in the day Beebe called Union President, Dan Harold saying that Boyce had asked him what he thought about Andrew's working inside the  Radio Room as needed. Harold said that  he did not care and that additional people were needed. Beebe asked about other employees working in the Radio Room as well and Harold again stated "I don't care who works the room as long as they are certified and follow the Union rules." Despite Andrew appropriate certification,  to this day he has not been permitted to work the room.

71.   On April 19, 2024, Andrew and Brigid were interviewed by the DELCO District Attorney's investigative office of  CID  with respect to Boyce.

72.   On May 3, 2024, Andrew  met with  Defendant and then Deputy Director Edward Beebe at 11:30 a.m.. Included in that conversation was Andrew's not  being able to work the Radio Room since April 1, 2024  despite Boyce's assurances that he could do so. Beebe stated that  Boyce was no longer working  and Andrew wasn't permitted to work there. Andrew informed Beebe that he had an issue with his allowing other  management

22

or non-bargaining employees to do whatever they want and work wherever they want, but that he was being kept at arm's length and not permitted to do so. Andrew also said that his wife had not been permitted to advance. At one point Andrew told Beebe and Mignogna "I have been an employee of DES for 17 years and I have wanted to advance myself here as I have interviewed for all openings during my tenure." Beebe responded that with the reports on Boyce growing, maybe the new director, when named, would allow Andrew to work as he requested. To date, Andrew has continued to be excluded from Radio Room work and earning the corresponding overtime.

73.    On May 6, 2024, the Union held a standard going-away lunch for Andrew and another recently promoted employee. Andrew went into the Radio Room at 11:30 am to offer to help cook. In the corner of his eye, he saw supervisor Heather Diehl standing there. She immediately said, "Andrew, what are you doing, are you working or visiting?" Andrew said that he was there on work. Notwithstanding, she continued the practice of barring him from the Radio Room, making him feel unwelcome in the very room in which he was to be celebrated.

74.    Andrew immediately left and went right to Defendant Beebe. He told Beebe how upset he was about the place and that everyday it's something new, stating that he was at the end of the road dealing with the issues and tired of the DES environment. He did not return to the lunch as he was told that he was not allowed in the room.

75.    Another employee, Fire Dispatcher Michael Ferrier, came up to Andrew after leaving Beebe's office. In disgust, Ferrier said that other employees can come in to the Radio Room and sit for an hour, but that Andrew could not be in there for 2 minutes.

76.    That same day, May 6, 2024 at 1:30 p.m., after the lunch, Brigid told Andrew that Chief Supervisor Joseph Blair wanted to speak to him. As Andrew walked into his office,

23

Blair started by saying he wanted to express his apology for what he called a  misunderstanding. Andrew stated that he didn't want to hear it and that he was tired of being treated and feeling the way he did at every turn. Andrew abruptly left Blair's office.

77.     Afterwards, Supervisor Diehl denied responsibility for Andrew's exclusion, telling employees of the Radio Room that when it came to Andrew,  "she was only doing what she was instructed to do."

78.     On May 7, 2024, Defendant Samantha Cox sent an email out about certification for the "Comms Truck" mobile command post for DES  stating that the email recipients were to respond back by May 14,  if  they were interested in keeping certification on this vehicle as she was scheduling classes. Andrew responded that he was interested and asked to be kept posted on what further actions he needed to take.  Consistent with his other exclusions, Andrew was removed from  eligibility with ZERO notification from Cox.

79.     For clarity, on May 7, 2024, Andrew  emailed  Beebe, Mignogna and  Blair requesting supporting documentation to explain how some groups of non-bargaining employees are allowed to work the Radio Room while others are not allowed to do so. To date, Andrew  has received no response.

80.     On May 9, 2024, Andrew met with Dana Howard, of  Delaware County HR/Personnel detailing all of the issues that he had experienced and continued to face each day.  To date, no remedial steps have been taken.

81.     Andrew learned that on July 17, 2024 Council approved a Memorandum of Understanding Between the County and the City of Chester that recognized the need for the Chester Police Department to supplement its staff during the summer months. "The CPD has requested that qualified County employees, including but not limited to those in the…….

24

Department of Emergency Services ("DES") be available to serve as part time employees of the CPD in the 'Turnkey' and 'Operations' positions respectively."   On July 18, he emailed Defendant Edward Beebe, expressing his interest in this work.  At first Beebe expressed ignorance about the matter, but then indicated that Andrew might be disqualified because he was in Emergency Services/HAZMAT.  Notably, the Memorandum made no such distinction.

82.     Andrew has been continually denied the ability to earn over time pay which can amount to  as much as $60,000 per year of additional income for those allowed to earn overtime.

83.     Andrew has been continually denied promotions for which he has applied.

84.     From the date of Boyce's separation from DES, Ed Beebe has been Acting Director who promoted Mignogna to be his deputy, both with the approval of Defendant County Council.  Clearly loyal to Boyce, they both  continue to retaliate against Plaintiffs and others who have brought claims, despite HR/Personnel and an outside law firm that was hired approximately last May to supposedly investigate the situation and report to County Council. As admitted by outside counsel on January 9, 2025 no investigative report has been filed.

85.     On November 20, 2024 Andrew was specifically told by DES' fleet manager, Robert Narcavage that he would  be assigned a new Dodge Durango vehicle. However, after Narcavage consulted with  Beebe, Andrew was instead told that he would be assigned Boyce's vehicle which had been idle since Boyce was put on leave. Andrew believes that this change in vehicle assignment was deliberately made to retaliate and emotionally upset him, given Boyce's history.  When Andrew protested this change, his superior, Larry Bak said " You need to get over that."

86.     On November 25, 2024 Andrew found out that he was passed over for a HAZMAT class.

87.     Numerous times,   Andrew has discovered problems with his time records as maintained by Defendant Regina Rodia, resulting in diminished pay for him.  As a result of her retaliation, Andrew has repeatedly  had to go to HR/Personnel, which as recently as in December, 2024 has reversed Ms. Rodia's shorting of Andrew's time.

88.     On November 26, 2024, Andrew wrote to Personnel Head Christine Keck with copies to Larry Bak and Edward Beebe addressing then current work issues, including the Boyce vehicle assignment, the fact that he was excluded from Hazmat class over the weekend of November 23 and 24, and the fact that he was excluded from Duty Representative conversation . He concluded the email by stating " As an employee of Delaware County Emergency Services I do not feel that I am in a protected, safe and secure environment."

89.     On December 2, 2024, Plaintiffs' attorney  wrote Defendants Lichtenstein and Keck demanding that Beebe, Mignogna and Rodia be placed on administrative leave pending an investigation, as had been standard HR/Personnel Department practice when it came to claims against DES employees. For example, DES employee Paula Richards had been placed on leave pending an investigation. Despite a host of obvious issues, Defendants have refused to do so. That letter is attached and made a part hereof as "Exhibit 1".

90.     On December 9, 2024 a meeting was held with Andrew, Brigid, Personnel Head Keck and Barbara Hatton with respect to the outstanding issues, including the damage occasioned by Ms. Howard in promoting anything but a place of care for employees and Howard's lack of independence or impartiality from Mr. Beebe. Plaintiffs expressed their discomfort in speaking with Ms. Howard,  convinced  that Ms. Howard would not maintain any confidentiality when it came to their concerns,  which would result in additional retaliation. Further, Brigid noted the fact that the Kline issue was allowed by Ms. Howard to sit idle for six

26

weeks while she  instead immediately addressed retaliatory claims against disfavored employees. Brigid again detailed her concern with the way the meeting with respect to Mr. Kline was conducted by Ms. Howard. The Paynes stated that they had reported multiple complaints to Ms. Howard going back to May 9 with nothing in the way of follow up and noted that Solicitor Lichtenstein pled ignorance to their claims.  The Paynes stated that " All these issues just keep mounting as to what everyone else is doing yet there is no accountability for these supervisors." Finally they supported their lawyer's calling for Beebe, Mignogna and Rodia to be put on administrative leave pending an investigation. They said that they could not understand why this had not already occurred.

91.    Plaintiffs learned that due to those calls made by them and others requesting that DES top management be placed on leave,  Ms. Keck and Ms. Howard instead retaliated against another complainant Maille Bonsall by placing her on leave on December 23 without explanation, allowing DES employees to wrongly assume that Ms. Bonsall had done something wrong. The day after CID's January 2, 2025 visit to Ms. Bonsall's home during which she was accused of recorded a meeting at the office, on January 3, 2025, Brigid overheard Defendant Mignogna loudly bragging about his threatening Ms. Bonsall, and bragging about his great relationship with Ms. Keck and  investigators.   Given Mignogna's immediate knowledge of what CID was doing,  the question occurs as to whether or not Mignogna was the originator of a false complaint. Considering what happened to Bonsall, Plaintiffs fear that they will suffer the same fate for challenging the powers that be, who are waiting for any possible excuse to get rid of them.

92.    In late December, 2024 certain pay issues were rectified by  HR/Personnel Head Ms. Keck with respect to Andrew.  This included pay for a lunch hour break. However, nothing

in the way of confidentiality was observed by HR/Personnel. This was evident on or about January 2, 2025 when Andrew was confronted by other DES employees who accused him of being responsible for DES employees losing their hour lunch break. Andrew protested this to Ms. Keck in an email of January 2, 2025 which concluded with the statement " The environment here remains unchanged here at DES; employees who come forth about issues and have been and continue to be, like myself targeted."

93.     Finally as recently as January 7, 2025 Andrew learned that Defendant Cox removed his name from various CTO classes that he was supposed to teach.

94.     With their experiencing retaliation on what seems to be a daily basis, Andrew has reported issues that involve him and his wife Brigid, to every level of Management and HR/Personnel, even having to repeat these reports to outside Counsel, who seemed ignorant of their prior complaints. However, instead of matters being rectified, the retaliation against both Plaintiffs increases and promises to continue even after the filing of this lawsuit.

95.     Moreover, Plaintiff Andrew Payne has experienced continuing and severe anxiety and depression as a result of Plaintiffs' demoralizing experience at DES.

96.     In sum, Andrew, together with his wife Brigid have repeatedly asserted their right to be treated fairly and to be afforded the same opportunities enjoyed by other employees. Instead, they have been retaliated against by Boyce loyalists, who resent them for asserting those rights. and resentful of their standing up for their rights.

### ADDITIONAL PERTINENT FACTS PERTAINING TO DEFENDANTS

97.     Upon investigation, information and belief, supervisory employee and Office Manager Regina Rodia was described by Boyce as his "right hand." She was Boyce's first promotion during his tenure. It is believed that for years, she has known about Boyce's offensive

and harassing exploits. Ms. Rodia has acknowledged to others that she knew that they were unsafe with Boyce and admitted that she should have warned them. At the same time it is believed that she never reported to HR/ Personnel what she had witnessed or otherwise had knowledge of . As recently as December 2, 2024 via correspondence from Plaintiffs' attorney ("Exhibit 1") it was insisted that Ms. Rodia be placed on leave pending an investigation. Instead, Plaintiffs and others have been retaliated against.

98.    Despite the fact that Mr. Beebe has worked for DES for decades and served with Boyce for years, comprising virtually all of Boyce's tenure with the County. This together with the fact that his office was only fifteen feet from Boyce's belies Mr. Beebe's claimed ignorance of Boyce's offensive and harassing exploits. Notwithstanding such professed ignorance, he was present, along with Ms. Rodia, at the tank-top incident referred to above. Moreover, upon information and belief, he has acknowledged to others that he knew of an incident at a local restaurant where Boyce proposed a sexual threesome that would include Boyce, a waitress, and a DES employee. At the same time it is believed that he never reported to the HR/ Personnel what he had witnessed or otherwise had knowledge of. As recently as December 2, 2024 via correspondence from Plaintiffs' attorney, it was insisted that Mr. Beebe be placed on leave pending an investigation. ("Exhibit 1") Instead, Plaintiffs and others have been retaliated against.

99.    Similarly, upon information and belief, Mr. Mignogna well knew of Boyce's indiscretions and harassing exploits, especially the complaints made to him by Brigid and Andrew. As recently as December 2, 2024 via correspondence from Plaintiffs' attorney, it was insisted that Mr. Mignogna be placed on leave pending an investigation. ("Exhibit 1") Instead, Plaintiffs and others have been retaliated against.

100. However, upon information and belief, despite their knowledge, there is no evidence that Mr. Beebe, Mr. Mignogna, or Ms. Rodia exercised each of their affirmative obligations as County employees to complain to HR/Personnel about Mr. Boyce. Instead, County policy and practice has been to retaliate against Plaintiffs and others who have complained, without disciplining the offenders.

101. Historically, Council Defendants, rather than exhibiting minimal oversight, rubber stamped Boyce's personnel requests. Apparently, the Council Defendants never bothered to ask why Boyce demonstrated a record of disproportionately favoring his personally-chosen young and inexperienced females and the front office to the detriment of other DES functions such as the Radio Room. Any review or investigation would have shown what was transpiring. However, despite the rampant rumors in the Courthouse, from County Council on down, the named Defendants have incredibly chosen to maintain that they had no idea of Boyce's inappropriate abuse.

102. Council's public stance of "see no evil, hear no evil" ignores the fact that Council Defendants had affirmative responsibilities to monitor their employees to comply with the requisites of federal, state and local law, including the County's own personnel policies.

103. The County Personnel Handbook specifically requires reporting of misconduct, which failed to take place with respect to Boyce. Upon investigation, information and belief, DES employees, Plaintiffs included, have been afraid to do so, fearful for their jobs and retaliation. However, had appropriate officers, such as County Solicitor Jonathan Lichtenstein, County Executive Director Barbara O'Malley, Personnel Head Keck, Acting DES Director Beebe and other supervisory personnel at DES been doing their jobs, Boyce would have been removed well before he had the chance to exploit Plaintiffs . Further, Beebe, Mignogna and

30

Rodia would at least be on leave pending an investigation, if not removed from employment altogether.

104. Boyce himself referred to his exploits as being protected by the powers that be, enjoying a situation where he was able to "hide in plain sight,", doubtless as a result of his prominence and political connections with Delaware County elected and party officials, including all named Defendants.

105. Despite Council's being formally put on notice of Boyce's preference for young female employees as result of Joanne Fisher's filing of an EEOC Charge in late January, 2024 listing Defendant Lichtenstein as the contact party for the County, no action was taken to investigate Boyce. Other EEOC charges involving Boyce's activities have since been provided to Defendant Lichtenstein, who has been listed as the County's contact party and chief legal official.

106. Frustrated by Defendants' total failure to make so much as an inquiry as to former DES employee Ms. Kahler's abrupt disappearance from work, Ms. Kahler (via counsel) on or about April 1, 2024 approached the DELCO District Attorney's office, imploring DA Stollsteimer to investigate and prosecute Boyce on behalf of Ms. Kahler and other women, who have been subjected to Boyce's abuse.

107. The DA's office performed an investigation, which included conducting interviews of the Plaintiff. It then referred the matter to the Pennsylvania Attorney General , purportedly to avoid a perceived conflict of interest, for further investigation and possible origination of criminal charges other than just those involving Boyce's involvement with Ms. Kahler.

108. As opposed to relying on information already provided to County and Council's

Solicitor, Jonathan Lichtenstein, Esquire, it was only in reaction to news of the DA's investigation, that Council placed Boyce on administrative leave, which was not until April 25, 2024.   Further, it was not until May 10, 2024 that County Council voted to terminate his employment, coming only days before the Pennsylvania Attorney General filed a May 16, 2024 criminal complaint against Mr. Boyce for his actions against Ms. Kahler.  All the while, Council President Monica Taylor, someone whom Boyce reportedly referred to as being "in his pocket," professed ignorance on her own behalf and on behalf of Council.

109.     The Criminal Complaint filed against Boyce with respect to Ms. Kahler charges Boyce with violations consisting of:

-18 Section 3126 sections A1:  Indecent Assault w/o the Consent of the other

-18 Section 2701 sections A3: Simple Assault

-18 Section 2709 sections A1 : Harassment – Subject Other to Physical Contact.

On September 11, 2024 a Magistrate held a preliminary hearing and bound him over for a Delaware County Court of Common Pleas criminal trial on all charges.

110.     An additional criminal complaint was filed by the Attorney General against Boyce on August 13, 2024 with respect to another alleged victim, DES employee Sara Senkow (Schieler).  During the preliminary criminal hearing conducted on September 18, 2024, she testified of her disgustingly inappropriate experience with Boyce going back to 2018, where Boyce showed her personal photos of his private parts maintained on his phone. She reported this to her then boss, Anthony Mignogna, and no action was taken against Boyce.  Allegedly, this was followed by a November, 2023 incident during which Boyce lifted her dress up to her thong undergarment, declaring that her tattoos were intriguing. She further testified that in January of 2024, Boyce put his hand on her butt, followed by a conversation later that month where Boyce

described various sexual positions that he would like to engage in with her. She reported this latest incident to her supervisor, Danielle Koerner, Chief of Special Operations. Upon information and belief,  Ms. Koerner dismissed her report and no action was taken against Boyce.  At the conclusion of the September 18, 2024 preliminary hearing,  Mr. Boyce was bound over for a  Delaware County Court of Common Pleas criminal trial on all charges.

111.     Ms. Senkow's (Schieler) testimony demonstrates more in the way of complaints to Delaware County supervisory personnel going all the way back to 2018, without action taken against Boyce. Given those complaints, Boyce should have been removed well before Plaintiff's appointment as his Executive Assistant in 2021.

112.     It was not until May 29, 2024 that  Executive Director O'Malley announced, in an email to DES employees, that " the County does not tolerate harassment, discrimination, retaliation, abuse of power, or other violations of the County code or policies." Despite the County's repeated use of that false mantra,  time and events detailed herein have shown that the County and Defendants named have long tolerated and continue to promote harassment, discrimination, retaliation, abuse of power and other violations of the County code or policies. Moreover Defendant O'Malley's words are also indicative of an intended whitewash, given her clear words in announcing the retention of an outside law firm "in an effort to assure that there are no violations of the code, policy or any other misconduct."  As of  January 8, 2025 Raymond McGarry, Esq. of that retained outside law firm, supplanting Personnel's own lawyers, has admitted that no report has yet been done.

113.     Upon investigation, information and belief, the questions posed by this "outside  law firm" have been geared to establish ignorance on the part of County Council. The clear implication  of this taxpayer-funded exercise is an effort to exonerate County Council, as well as those on down, from any responsibility whatsoever when it comes to oversight of

County employee, Tim Boyce. Upon information and belief, at least one interviewee told the law firm that everyone at the County knew of Boyce's behavior. The question arises as to whether that outside law firm has been complicit along with the rest of the named Defendants in not taking steps to rectify the situation.

114.    Regardless of the County Council's denial of knowledge, the County Code at Section 6-18 makes the Personnel Department affirmatively "responsible for coordinating and overseeing the  hiring, training, assignment, reassignment, rotation, performance evaluation and discharge of all personnel in the merit service and in unclassified positions." Further, the Department is responsible for "the establishment of duties and qualifications for all positions in consultation with the heads of County departments and offices."  Instead of investigation, oversight, consultation and evaluation, Plaintiff believes that Boyce was given carte blanche to do whatever he chose to do as rubberstamped by County Council.

115.    During Plaintiff's tenure, Delaware County has had in force a Personnel Handbook setting forth affirmative responsibilities of employees. Under the heading "Employment Policies" is the following statement: "The County of Delaware is committed to a policy of equal employment for all individuals. According to Title VI and Title VII of the Civil Rights Act of 1964 and other Federal, State, and Local Laws, the County of Delaware is an equal employment opportunity and prohibits discrimination on the basis of race, color, religion, disability, ancestry or national origin, gender, age, and military service. All personnel actions and decisions… is predicated solely on ability and the basis of valid job-related requirements." Clearly the Defendants have violated this professed standard in multiple ways and at multiple times.

116.     Under the Handbook  section "Rules of Conduct" is a paragraph headed "Harassment & All Forms of Discrimination" stating in pertinent part that " Harassment of one employee by another will not be tolerated. Actions such as sexual threats, inappropriate

34

comments, or physical contact of any nature are examples of harassment and will be considered justifiable grounds for discipline up to and including discharge." Further, it states that a "Department Director or Supervisor who receives information regarding a complaint must act on that complaint." Defendants' "Head in the Sand" approach doesn't absolve them of responsibility of taking the required steps nor does it absolve the supervisory personnel named herein who witnessed and/or were told about infractions by Boyce.

117.    As detailed herein, Plaintiffs' experience and that of others have hardly been indicative of any commitment by the County to applicable law or policy. Had there been any commitment, Boyce would have been long gone prior to Brigid's becoming his Executive Assistant.

118.    During Plaintiffs' tenure, the DELCO website touted Mr. Boyce, stating that "As Director, Mr. Boyce leads a staff of 125 dedicated public servants that [sp] operate the County's 911 communications center, coordinate emergency management plans and provide a wide variety of public services to augment and support first responders and the public."

119.    Incredibly, despite what has been pointed out hereinbefore, all known by pertinent defendants, Mr. Beebe, of all people, has been allowed by Council to succeed Boyce with a formal announcement on September 5, 2024 by County Executive Director Barbara O'Malley to DES employees that:

> It is my pleasure that County Council has approved the appointment of Ed Beebe as Interim Director of the Department of Emergency Services effective September 9. **As you know, we conducted many interviews through an external firm, speaking with many employees at DES. Based on the results of those conversations and his experience, we have complete confidence in the appointment of Ed Beebe as Interim Director. (emphasis added)**
>
> We greatly appreciate the patience displayed by the entire team as we took time to ensure we have made the best decision for the department. Ed Beebe has shown

35

care and commitment to the department and leadership during this challenging time. Ed Beebe is empowered to make decisions and to manage the department in his role as interim director. We also value his experience to work with executive staff here in the County to address the concerns identified by DES employees.

…

At this point, we do not have any plans to post for a replacement director. Recognizing the unique situation, we are in and the stability and familiarity that Ed Beebe brings to this role, we will maintain an Interim Director for a more lengthy time period …

We look forward to Ed Beebe's tenure as leader of the department We appreciate all the work you do to keep the County safe.

120.    With this announcement,  Ed Beebe promptly promoted Anthony Mignogna to be his Deputy, with the approval of Council, despite the fact that Plaintiffs had complained to Mignogna as well as Beebe, with no evidence of follow-through on their part.

121.    Contrary to Ms. O'Malley's assertion, Edward Beebe and Anthony Mignogna never showed leadership or commitment to act in a way that kept Brigid or other females safe or avoid any retaliation against Andrew, let alone did they comply with County Code reporting requirements. For years, they and others, including Office Manager Rodia, Deputy Mignogna, and Ms. Samantha Cox,  had information and were in a position where they could have had Boyce removed.

122.    As per the website quoted previously herein, a  "public servant" is what Brigid set out to be when she joined the DES; not a sex toy or a vulnerable piece of meat.  So too has  Andrew sought to be a "public servant" without being retaliated against as he has.

123.    Defendants have allowed DES to exemplify a place of blatant sexism, sexual harassment, and retaliation rather than to exemplify a place of public service.

36

124.    Instead of Defendants' providing Plaintiffs with a safe working environment where they could progress as  public servants based on their ability, Defendants provided Boyce with the opportunity to maintain unwilling "servants" for his personal sexual desires, and have affirmatively retaliated against Plaintiffs for adhering to the County Code and coming forward.

125.    Plaintiffs' own shockingly devastating experiences, with the attendant existence of a hostile environment during and after the Boyce era, promise to continue to traumatize them for the rest of their lives as they don't understand why the County Code and applicable law have been ignored by Defendants.

126.    Had County Council,  its members, together with the rest of the Defendants named, and undoubtedly others unnamed, exercised their affirmative responsibilities to provide a lawful and safe workplace at DES, Boyce would have been long gone from County employment, depriving him of the opportunity to exploit Plaintiffs . Their years of calculated inaction, going at least back to 2018, render these Defendants liable.

127.    What is more, even with Boyce gone,  Plaintiffs have since unnecessarily and unjustifiably experienced retaliation by current Acting Director Edward Beebe and others. This retaliation promises to continue given the fact that Beebe, Mignogna and others have been loyal allies of Boyce's when it came to protecting him.

<u>COUNT I</u>

**VIOLATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION and THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. SEC. 1983**

**Brigid Payne v. County of Delaware & All Defendants in Their Official & Individual  Capacities**

128.    Plaintiffs restate and reallege paragraphs 1 through 127  as though set forth here in full.

37

129.    A plaintiff asserting a civil rights violation under Section 1983 must establish (1) the deprivation of a right secured by the United States Constitution or federal law; and (2) that the alleged violation was acting under color of state law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996)  Here liability rests with the governmental unit.

130.    Defendant County, its officials, and supervisory personnel have discriminated against the Plaintiff Brigid by depriving  her of  her rights, privileges and immunities secured by the Constitution or laws of the United States as applied to the States pursuant to the Fourteenth Amendment. The Fourth Amendment to the U.S. Constitution as extended by the Fourteenth Amendment provides a right to be free from unreasonable searches and seizures in conjunction with respect to  governmental activity. Specifically, the Due Process and Equal Protection clauses of the Fourteenth Amendment recognize Brigid's right to be free from sexual misconduct and/or abuse at the hands of a County employee.  Specifically, the Third Circuit has recognized that "[i]ndividuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008)

131.    Furthermore, 14th Amendment notions of "substantive due process" and  a "right to privacy" further  protect Plaintiff Brigid from what she has experienced. "To demonstrate that her substantive due process rights were violated [Plaintiff] must establish that "the government's deprivation of that protected interests shocks the conscience." *Kane v. Berger*, 902 F.3d 185, 192 (3d Cir. 2018) (citing *Chainey v. Street*, 523 F. 3d 200, 219 (3d Cir. 2008) What Plaintiff has experienced certainly fulfills the "shocking to the conscience" standard  in terms of what she endured at the hands of Boyce and the deliberate indifference of County officials to Boyce's previous behavior. Case law which found official conduct and officials'

38

responses thereto to have shocked the conscience involve serious sexual battery and assault such as that experienced by Brigid.

132.    Plaintiff Brigid  must, and has, satisfied the "state-created danger" theory of liability, requiring Plaintiff to plead four elements. First, there must be foreseeable and fairly direct harm. Second , there must be action marked by "a degree of culpability that shocks the conscience". Third, there must be a relationship with the governmental unit that makes the plaintiff a foreseeable victim, rather than simply a member of the public, in general. Fourth, there must be an affirmative use of governmental authority in a way that created the danger. *Johnson v. City of Phila*., 975 F.3d 394, 400 (3d Cir. 2020) (citing *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018)

133.    Boyce's conduct, as a state actor utilizing his official position and capacity, as set forth hereinabove, amounted to an invasion of Plaintiff Brigid's constitutional right to personal security from sexual exploitation,  violating her constitutional right to bodily integrity.

134.     Having affirmative responsibilities as herein referenced, Defendant County, together with its officials and named Defendants instead provided an atmosphere enabling Boyce to violate the rights of Plaintiff Brigid and others.

135.     Plaintiff Brigid avers that Defendant County and its officials, for years, has had  unconstitutional customs and policies of deliberately ignoring and failing to investigate Boyce's misconduct against Plaintiff and others, failing to adequately supervise and train County employees with respect to maintaining, preserving and protecting Plaintiff and other women from violations of their right to personal security and bodily integrity.

39

136.     Defendant County and those named in their official and individual capacities, along with others, have acted intentionally, deliberately, willfully, and have conducted themselves in callous and  deliberate disregard of  Plaintiff Brigid's rights enabling Boyce to violate those rights.

137.     As a direct and proximate result of  Defendants' actions, Plaintiff Brigid has suffered and will continue to suffer embarrassment, humiliation, financial harm, emotional and psychological harm, and pain and suffering, some or all of which may be permanent.

138.     As a direct and proximate result, Plaintiff has incurred attorneys' fees and other costs.

139.     By reason of Defendants' action and inaction amounting to violation of Section 1983 protections, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff  Brigid demands judgment in her favor and specifically against Defendant County of Delaware and  the named Defendants acting in their official and individual capacities and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, together with punitive damages given that Defendants were reckless or callously indifferent, together with  reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## COUNT II

### VIOLATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION and THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. SEC. 1983

**Andrew Payne v. County of Delaware & All Defendants in Their Official & Individual Capacities**

140.	Plaintiffs restate and reallege paragraphs 1 through 139 as though set forth here in full.

141.	A plaintiff asserting a civil rights violation under Section 1983 must establish (1) the deprivation of a right secured by the United States Constitution or federal law; and (2) that the alleged violation was acting under color of state law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) Here liability rests with the governmental unit.

142.	Defendant County, its officials, and supervisory personnel have discriminated against the Plaintiff Andrew by depriving him of his rights, privileges and immunities secured by the Constitution or laws of the United States as applied to the States pursuant to the Fourteenth Amendment. The First Amendment to the U.S. Constitution as extended by the Fourteenth Amendment provides a right to be free speech. Specifically, the Due Process and Equal Protection clauses of the Fourteenth Amendment recognize this Plaintiff's right to be free from retaliation as a result of exercising his right to free speech.

143.	Having affirmative responsibilities as herein referenced, Defendant County, its officials, and named Defendants instead affirmatively provided an atmosphere enabling violation of the rights of Plaintiff Andrew.

144.	Plaintiff Andrew avers that Defendant County and its officials, for years, has had unconstitutional customs and policies of deliberately ignoring and failing to investigate Boyce's misconduct against Plaintiff and others, failing to adequately supervise and train County employees with respect to maintaining, preserving and protecting Plaintiff

41

Andrew's right to be free of retaliation for exercising his rights to free speech, generally, and specifically when it came to the sexual harassment experienced by his wife, Brigid.

145.    Defendant County and those named in their official and individual capacities, along with others, have acted intentionally, deliberately, willfully, and have conducted themselves in callous and deliberate disregard of Plaintiff Andrew's rights.

146.    As a direct and proximate result of Defendants' actions, Plaintiff Andrew has suffered and will continue to suffer embarrassment, humiliation, financial harm, emotional and psychological harm, and pain and suffering, some or all of which may be permanent.

147.    As a direct and proximate result, Plaintiff Andrew has incurred attorneys' fees and other costs.

148.    By reason of Defendants' action and inaction amounting to violation of Section 1983 protections, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff Andrew demands judgment in his favor and specifically against Defendant County of Delaware and the named Defendants acting in their official and individual capacities for retaliation in violation of his First Amendment rights and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages given that Defendants were reckless or callously indifferent, together with reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

**COUNT III**

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000 *et seq***

**SEX DISCRIMINATION, MAINTENANCE OF A HOSTILE WORK ENVIRONMENT & RETALIATION**

**Brigid Payne  v. The County of Delaware, Pa**

149.    Plaintiffs restate and reallege paragraphs 1 through 148 as though fully set forth herein.

150.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, et seq. as amended by the Civil Rights Act of 1991 ("Title VII), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

151.    Discrimination on the basis of sex that creates an abusive and hostile work environment, such that the conditions of employment are altered, is actionable under Title VII as sex discrimination. In order to establish a hostile work environment, five factual elements must be established: (1) that the employee suffered intentional discrimination because of his or her protected characteristic; (2) that the discrimination detrimentally affected him or her; (3) that the discrimination was pervasive and regular; (4) that the discrimination would detrimentally affect a reasonable person in the same position as the employee; and (5) that respondeat superior liability exists.

152.    In the totality of circumstances described in the facts set forth hereinbefore, when it comes to Plaintiff  Brigid's physical mistreatment on account of her sex, the foregoing five elements are established.

153.    In addition, under Title VII, a hostile environment exists when the workplace "is permeated with discriminatory, intimidation, ridicule and insult, that is sufficiently

43

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." In addition to Boyce's explicit sexual advances, a work environment remains that involves gender-based animosity, including sexist comments, remarks that intimidate, ridicule and maliciously demean the status of women creates an environment that is considered as hostile.

154.     Plaintiff's work environment has consisted of both sexually harassing behavior as well as gender-based animosity, including sexist comments. By requiring Plaintiff to work in a sex-based hostile environment consisting of both verbal and physical abuse by Tim Boyce and his successors, Defendant County has violated Plaintiff's right to work in a non-abusive working environment.

155.     Further, Plaintiff Brigid has been retaliated against as a result of standing up for herself and reporting misconduct to her superiors. Retaliation is actionable under Title VII . In order to establish a hostile work environment, a plaintiff must demonstrate that she engaged in statutorily protective activity, that the employer took a materially adverse employment action against them and that the protected activity and adverse job action are casually connected.

156.     Defendant is also liable for discrimination alleged herein under the doctrine of *respondeat superior* due to the actions and statements of its managers and employees.

157.     Defendant is liable for the acts of management, Plaintiff's supervisors, and others, because they knew of the existence of a discriminatory, retaliatory and a hostile work environment but allowed the illegal acts and practices to continue and took no corrective action.

158.     Defendant is liable for the acts alleged herein because its governing body, appointed directors, supervisors, managers and employees established the culture which encouraged sex discrimination, harassment and retaliation against women in DES.

159.      Based upon the foregoing facts, Defendant has discriminated against

Plaintiff on the basis of her sex, maintained a hostile working environment and has retaliated against her,  all  depriving her of her rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq. as amended.

160.         Defendant's conduct has been intentional, deliberate and willful, with malice or callous and reckless indifference to Plaintiff's rights protected by the United States, as well as the laws of the Commonwealth of Pennsylvania and the County Code, all conducted in callous disregard of the rights of the Plaintiff.

161.         Defendant's policies and/or practices have produced a disparate impact against the named Plaintiff with respect to the terms and conditions of employment.

162.         By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff  Brigid demands judgment in her favor and against Defendant County of Delaware and request an award of relief including but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs and other relief as permitted under the law and as this Court deems just and proper.

## COUNT IV

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED, 42 U.S.C. § 2000 *et seq***

### RETALIATION

**Andrew Payne  v. The County of Delaware, Pa**

163.         Plaintiffs restate and realleges paragraphs 1 through 162 as though fully set forth herein.

164.         Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, et seq. as amended by the Civil Rights Act of 1991 ("Title VII), makes it unlawful to retaliate against

employees who assert their rights under the law. Here, Plaintiff Andrew has been retaliated against as a result of standing up for the rights of his wife when it came to sex discrimination and an illegal hostile work environment.

165. Retaliation is actionable under Title VII . In order to establish a hostile work environment, a plaintiff must demonstrate that he engaged in statutorily protective activity, that the employer took a materially adverse employment action against them and that the protected activity and adverse job action are casually connected.

166. In the totality of circumstances described in the facts set forth hereinbefore, the foregoing elements are established.

167. Defendant is liable for discrimination alleged herein under the doctrine of *respondeat superior* due to the actions and statements of its managers and employees.

168. Defendant is liable for the acts of management, Plaintiff Andrew's supervisors, and others, because they knew of the existence of a discriminatory, hostile and retaliatory work environment but allowed the illegal acts and practices to continue and took no corrective action which would allow him to advance

169. Defendant is liable for the acts alleged herein because its governing body, appointed directors, supervisors, managers and employees established the culture which encouraged sex discrimination, harassment and retaliation in the DES.

170. Based upon the foregoing facts, Defendant has discriminated against Plaintiff Andrew in retaliating against him, all depriving him of his rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq. as amended.

171. Defendant's conduct has been intentional, deliberate and willful, with malice or callous and reckless indifference to Plaintiff's rights protected by the United States, as well as the laws of the Commonwealth of Pennsylvania and the County Code, all conducted in callous disregard of the rights of the Plaintiff.

172.         Defendant's policies and/or practices have produced a disparate impact against the named Plaintiff with respect to the terms and conditions of his employment.

173.         By reason of Defendant's discrimination, Plaintiff Andrew is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff Andrew demands judgment in his favor and against Defendant County of Delaware and requests an award of relief including but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs and other relief as permitted under the law and as this Court deems just and proper.

## COUNT V

### NEGLIGENCE
### (INCLUDING NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

### Brigid Payne and Andrew Payne v. Delaware County and All Defendants

174.         Plaintiffs restate and reallege paragraphs 1 through 173 as though set forth here in full.

175.         At all relevant times these Defendants knew or should have known that Boyce had a reputation for inappropriate behavior and/or conduct with Plaintiff Brigid and other females, years before her. Aside from their affirmative obligations cited hereinbefore, upon information, investigation, and belief, this knowledge ran the gamut from rumor and innuendo, to specific observation of Boyce's infractions. Notwithstanding, these Defendants took no action to protect Plaintiffs Brigid and Andrew, neglecting to act pursuant to their mandated responsibilities to investigate, take personnel action and/or intervening action to prevent what had transpired with Plaintiffs and others before her.

47

176.    At all relevant times, Defendants had a duty to recognize inappropriate conduct by Boyce and to protect them.

177.    At all relevant times, Defendant County and top management thereof failed to properly train County employees to recognize and  prevent inappropriate relations and/or conduct between County employees in the workplace.

178.    At all relevant times, when it came to Boyce's interaction with female employees, the Defendants knew or should have known that Boyce's inappropriate behavior were warning signs that female employees, including Plaintiff, were in danger while they were in the care, custody and control of Defendant County.

179.    At all relevant times, Defendant County, County Council Members, County Solicitor, County Executive Director and those in its Personnel Department, all  named as Defendants herein failed to conduct anything in the way of routine checks or investigations with respect to DES.

180.    Not only did the above-named Defendants fail to take any timely corrective  affirmative action against Boyce, as was their duty to Plaintiff and other women, they allowed  Boyce to remain employed with access to the workplace premises and allowed him to have the ability to engage in inappropriate conduct towards females.

181.    Further, Defendant County, County Council Members, the County Solicitor, Executive Director and members of the Personnel Department named as defendants were negligent when it came to the selection of Boyce's replacement Edward Beebe and the selection of Anthony Mignogna as Beebe's deputy, given their knowledge of allegations against Boyce.

182.    In allowing Boyce to act as he had with respect to Plaintiffs and with respect to the retaliation that has been allowed to take place against Plaintiffs and others thereafter up to the present, all Defendants are responsible for Plaintiffs suffering severe emotional distress.

183.    All Defendants' actions and/or omissions as set forth in the foregoing paragraphs do constitute such negligent, wanton, willful and reckless conduct such that Plaintiffs are entitled to the relief requested for their  losses and damages as a result of Defendants' negligence, including punitive damages.

184.    By reason of the foregoing, Plaintiffs are entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendant County of Delaware and the named Defendants and request an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## COUNT VI

### NEGLIGENT SUPERVISION OF TIMOTHY BOYCE & EDWARD BEEBE

**Brigid and Andrew  Payne v. Delaware County, County Council, Councilmembers  Monica Taylor, Elaine Paul Schaefer, Kevin M. Madden, Christine A. Reuther, Richard R. Womack, Jonathan Lichtenstein, Christine Keck, and Barbara O'Malley**

185.    Plaintiffs restate and reallege paragraphs 1 through 184 as though set forth here in full.

49

186.     Plaintiffs bring this Count of Negligent Supervision against those individuals above-named in both their official and individual capacities.

187.     The above-named Defendants, including but not limited to the County's elected leadership were negligent in the supervision of Timothy Boyce and Edward Beebe, thereby allowing them to run DES and engage in the conduct heretofore alleged.

188.     It has long been the law in Pennsylvania that an employer may be liable in negligence if it knew or should have known that an employee, such as Boyce or Beebe was dangerous, careless, or incompetent, and such employment might create a situation where the employee's conduct would harm a third person, in this case Plaintiffs.

189.     The named Defendants had an affirmative duty to provide reasonable supervision of its employees and agents, specifically Timothy Boyce and his replacement Beebe.

190.     Given the innuendo that circulated and what has been otherwise described hereinbefore where those Defendants themselves gained information as to why Beebe should not have been appointed as Boyce's replacement in the first place, it was reasonably foreseeable that the named Defendants should have monitored and investigated Boyce and Beebe such that they would not have been able to act as they did when it came to Plaintiff Brigid and to retaliate against Plaintiff Andrew.

191.     Instead, the named Defendants made the conscious decision to continue to employ Boyce, until Jackie Kahler went to the DELCO District Attorney

50

and subsequently name Beebe in his stead.

192.    To willfully allow Boyce to be in a position placing employees safety, security, privacy and bodily integrity shocks the conscience and at the very least was reckless in nature.

193.    Moreover, the named Defendants failed to formulate, adopt, implement and/or use an appropriate monitoring system to ensure the protection of Plaintiffs and/ or others similarly situated when they knew or should have known that Boyce had a reputation and/or propensity for acting inappropriately with female employees.  The negligence of the named Defendants was the proximate cause of Plaintiff's actual loss and injury.

194.    Given Defendant Beebe's retaliation against Plaintiffs, so too have the named Defendants failed to monitor him to ensure the protection of Plaintiffs and/or others similarly situated, especially given the complaints made on behalf of Plaintiffs and others.

195.    The named Defendants' breach of their duties to Plaintiffs  to provide reasonable supervision of Boyce and Beebe  has been outrageous and committed willfully or with reckless indifference to Plaintiffs and others who after total frustration with HR/Personnel had their counsel submit his letter of December 2, 2025 ("Exhibit 1")

196.    Further, HR/Personnel has breached any notion of confidentiality with respect to Plaintiffs, subjecting them to further ridicule and retaliation at their workplace.

197.    All of the named Defendants' actions and/or omissions as set forth in the foregoing paragraphs do constitute such negligent, wanton, willful and reckless conduct

such that Plaintiff is entitled to the relief requested for her losses and damages as a result of their negligent supervision of Boyce and Beebe.

WHEREFORE, Plaintiffs demand judgment in their favor and against the named Defendants and request an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## COUNT VII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### *Brigid Payne and Andrew Payne vs. Edward Beebe and Delaware County*

198.    Plaintiffs restate and reallege paragraphs 1 through 197 as though set forth here in full.

199.    Defendant County, through Edward Beebe in both his official capacity and individually,  have both inflicted severe emotional distress upon Plaintiffs.  This tort has been recognized as something not created by contract, but rather something independent of contract, instead imposed by the law of torts *Dobson v. Milton Hershey School*, 336 F. Supp. 3d 428,439  (M.D. Pa. 2018)  *Remlinger v. Leb. Cnty*, Civil No. 1:18-cv-00984, page 12, (M.D. Pa. Jun. 11, 2020), (Citing Dobson)

200.    Instead of rectifying the situation at DES with his promotion to head DES, Mr. Beebe has knowingly fostered a circus-like atmosphere of gossip, deceit, and retaliation which is anything but professional. Plaintiffs have had to continually stand up for themselves when it comes to being retaliated against.  Wondering how he and his wife can continue to endure the environment, Andrew has had repeated instances where he couldn't take it

52

and left for the day. He has resorted to professional counseling, but has instances where he remains overwhelmed wondering why, despite making complaints to Personnel, he and his wife continue to be victimized and considered the enemy by Beebe and his cohorts.

201.         By their actions when it came to their treatment of Plaintiffs, all as described hereinbefore: (1) these Defendants have engaged in extreme and outrageous conduct, (2) which conduct caused Plaintiff to experience severe emotional distress, (3) and these Defendants acted intending to cause such distress or acted recklessly with knowledge that the same was substantially certain to occur.

202.         Emotional distress includes all of Plaintiffs' unpleasant mental reactions, including but not limited to fright, horror, grief, shame, humiliation embarrassment , anger, chagrin , disappointment, worry and extreme anxiety.

203.         In accord with this Court's ruling in  *Corbett v. Morganstern*, 934 F. Supp. 680, 684-685 (E.D. Pa. 1996),  Plaintiffs' symptoms, which include " 'symptoms of severe depression, nightmares, stress and anxiety, requiring psychological treatment, and … ongoing mental and emotional harm' sufficiently state physical  harm or injury to sustain causes of action for infliction of emotional distress."

204.         Especially given the circumstances,  the extreme and outrageous conduct by these Defendants goes beyond all possible bounds of decency and has to be regarded as atrocious and utterly intolerable by a reasonable person in a civilized society.

205.         As a direct and proximate result of the extreme and outrageous conduct of these Defendants as set forth above, Plaintiffs  have suffered severe emotional distress including but not limited to humiliation, mental anguish, frustration, stress, loss of self-esteem and other actual consequential and non-pecuniary damages.

53

206.                The extreme and outrageous conduct of these Defendants, as set forth above, which was committed with a reckless indifference to the rights of Plaintiffs, warrant the imposition of punitive damages.

WHEREFORE, Plaintiffs demands judgment in their favor and against the named Defendants and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

## JURY DEMAND

The Plaintiffs demand trial by jury of all issues triable of right to a jury.

## CERTIFICATION

I hereby certify that to the best of my knowledge and belief the above matter in controversy is the subject of any other action pending in this court; namely the case of Kahler vs. Delaware County, et al. filed at  2:24-cv-05219-MRP and Bonsall vs. Delaware County, et al. filed at 2:24-cv-05866 before  Judge Mia Roberts Perez  It is Plaintiff's position that this case be consolidated with the Kahler and Bonsall cases  for discovery purposes.

Respectfully Submitted,

/s/ Mark D. Schwartz
Mark D. Schwartz, Esquire
P.O. Box 330
Bryn Mawr, PA  19010-0330
Telephone & Fax: 610 525-5534
Email: MarkSchwartz6814@gmail.com
Pa. I.D. #30527

Date: January 17, 2025                Counsel for Plaintiffs Brigid and Andrew Payne